IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

DERESE BARNES,                          )
                                        )
              Plaintiff,                )
                                        )
        v.                              )        1:16cv940
                                        )
DAVID J. SHULKIN, M.D.,                 )
SECRETARY, U.S. DEPARTMENT OF           )
VETERANS AFFAIRS,[1]                    )
                                        )
              Defendant.                )

**MEMORANDUM OPINION AND ORDER**

THOMAS D. SCHROEDER, District Judge.

        This is an employment discrimination action by Plaintiff
Derese Barnes arising out of his hiring and subsequent failure to
be promoted at the Fulton Veterans Affairs Medical Center in
Durham, North Carolina (the "Durham VA").  Barnes claims racial
discrimination in the setting of his position and pay at hiring;
retaliation for having engaged in protected activity, and failure
to promote based on racial discrimination.  Before the court is
Defendant's motion for summary judgment on all claims.  (Doc. 18.)
The motion has been fully briefed (Docs. 19 through 28) and is
ready for decision.  For the reasons set forth below, the motion
will be granted and the action will be dismissed.

_____
[1]  David J. Shulkin became the Acting Secretary of Veterans Affairs on
February 14, 2017, resulting in his substitution as Defendant, pursuant
to Federal Rule of Civil Procedure 25(d).

## I.    BACKGROUND

The facts, viewed in the light most favorable to Barnes as the non-moving party, demonstrate the following:

### A.    The Durham VA'S Hiring and Promotion Policies

Candidates who wish to apply for a nursing position at the Durham VA must do so electronically.  (Doc. 20-2 at 23.)  A collection of Durham VA nurse recruiters and others from human resources review the applications for minimum qualifications and forward them to the selecting individuals, who then begin the interview process.  (Id. at 24.)  Once the interviews are completed, a nurse recruiter will work with the candidates to ensure that they have submitted as much relevant information about themselves as possible.  (Id.)  That information is then passed on to the Durham VA's Nursing Professional Standards Board ("NPSB") for its review.  (Id.)

The NPSB is a group of thirty to forty nurses, all appointed by the Nurse Executive, and is responsible for making recommendations as to the grade, level, step, and salary for every nurse at the Durham VA.  (Doc. 19-4 at 14, 18-20; Doc. 20-2 at 24.)  Published standards delineate the classification of various healthcare professionals.  A Nurse I (nurse grade I) is someone whose nursing practice benefits only his own patients, while a Nurse II (nurse grade II) is one whose nursing practice benefits the entire nursing unit.  (Doc. 19-4 at 21; Doc. 19-5 at 14.)  A

Nurse III (nurse grade III) is one who influences a whole facility. (Doc. 19-4 at 21-22.)  The NPSB's recommendation as to a nurse's starting grade is made by a three-member panel of the NPSB that evaluates objective and subjective criteria, and must be unanimous.  (Doc. 19-4 at 18–21; Doc. 19-6 at 20–24; Doc. 20-1 at 36, 41.)  Once the nurse's grade has been decided, there is a formula to determine the level, step, and salary for the nurse based on his education and experience.  (Doc. 19-6 at 22–23; Doc. 20-1 at 39–41.)

    The NPSB examines four dimensions of nursing, as well as a set of published NPSB guidelines, when making a recommendation as to a nurse's grade.  (Doc. 19-4 at 21, 38).  These dimensions are (1) Practice,[2] (2) Professional Development,[3] (3) Collaboration,[4] and (4) Scientific Inquiry.[5]  (Id. at 15.)  Once the NPSB makes its recommendation, the Nurse Executive must approve it before it becomes final.  (Doc. 19-5 at 45–46.)

---

[2] Practice is defined as how nurses take care of their patients.  (Doc. 19-4 at 16; Doc. 20-1 at 35.)

[3] Professional Development is defined as how nurses seek to develop their nursing practices, such as by seeking certifications, opportunities for education, and keeping their licenses and credentials current.  (Doc. 19-4 at 16; Doc. 20-1 at 36.)

[4] Collaboration is defined as how well nurses works with other individuals.  (Doc. 19-4 at 16; Doc. 20-1 at 36-37.)

[5] Scientific Inquiry is defined as how nurses apply research in their nursing practice and research projects that they have worked on.  (Doc. 19-4 at 16; Doc. 20-1 at 37.)

After the Nurse Executive approves the recommendation, a nurse recruiter will extend the candidate a formal job offer that includes the starting level and salary. (Doc. 20-2 at 24-26.) If the applicant believes his starting level or salary is too low, he can work with the nurse recruiter to ensure that the NPSB had all his relevant information. (Id. at 24.) However, the Durham VA does not negotiate salaries. (Id. at 24-26.) Once a candidate has accepted an offer, there is no reconsideration process, and the salary should deviate from the salary quoted only if the NPSB committed an error, such as failing to take into account information that was provided to it, and corrects it. (Id. at 30-32.)

Promotions are handled differently. When the NPSB meets to make promotion recommendations, it meets in a panel of five members who review a proficiency report written by a supervisor of the nurse in question. (Doc. 24 at 104-08.) The proficiency report is read aloud by the chairperson, and the board will vote on whether the candidate meets each of nine elements required for promotion. (Id. at 106-08).[6] In order to be promoted, a candidate must receive at least three of the five board members' favorable vote as to each of the nine required elements. (Id. at 106-08,

---

[6] These nine elements are Practice, Ethics, Resource Utilization, Education/Career Development, Performance, Collaboration, Collegiality, Quality of Care, and Research. (Doc. 25 at 84.)

124.)

The NPSB takes precautions to ensure that the NPSB members who are considering a candidate for promotion do not know the candidate's identity. For example, NPSB members do not take part in promotion considerations for nurses with whom they work. (See Doc. 25 at 48.) Further, only two of the five members actually know the name of the candidate in question — the chairperson and the secretary. (Doc. 24 at 107.) Otherwise, the chairperson omits all identifying information about the candidate when reading the proficiency report. (Id. at 106.)

**B.   Barnes's Hiring**

In June of 2013, Barnes, an African American male, applied to work at the Durham VA in response to the Durham VA's vacancy announcement for a Temporary Registered Nurse for its Psychiatry Unit. (Docs. 1-1 through 1-3.) The announcement stated that a successful applicant's starting level and salary would be determined by the NPSB. (Doc. 1-1 at 2.)[7] It further explained that to be hired as a Nurse II, a candidate would need a Bachelor's of Science degree in Nursing and at least two years of nursing experience. (Id. at 3).

Barnes submitted his resume and application to the Durham VA

---

[7]   The announcement contained an error in its posted salary range. It stated that the salary range for the position was $70,429 to $103,224. (Doc. 1-1 at 1.)  The correct salary range was $50,669 to $103,224. (Doc. 19-5 at 83.)

on April 6, 2013.  (Docs. 1-2, 1-3).[8]  Barnes's resume stated that

he had a Bachelor of Science in Nursing and five years of nursing

experience, four of which as a charge nurse.  (Doc. 1-2 at 1.)[9]

Barnes did not specify his race on his application or resume, but

he claims that his application materials included a form on which

he identified his race as African American.  (Doc. 19-2 at 45–

46.)[10]  On June 4, Barnes received a call from Nurse Recruiter

Kenneth Hodges, who told Barnes that he had been selected for the

position but did not mention Barnes's starting level or salary.

(Doc. 19-2 at 47–49; Doc. 23-3 at 20–21.)

On June 5, Barnes claims, he sent Hodges a letter of

recommendation and a PowerPoint document, noting his professional

accomplishments with reference to each of the dimensions of nursing

and with the expectation that Hodges would forward the documents

to the NPSB.  (Doc. 23-3 at 23; Doc. 23-8.)[11]  On June 7, the NPSB

---

[8] In his complaint, Barnes alleges he applied specifically for the Nurse II position, but the application itself does not allow application for a specific level.  (Doc. 1 ¶ 22; Doc. 1-3.)  Instead, an applicant simply applies, and his level and salary are determined by the NPSB.

[9] A charge nurse is a nurse that assigns staff to patients based on patient needs and staff availability.  (Doc. 19-4 at 27–28).

[10] The only support for this claim is Barnes's testimony.  (Doc. 19-2 at 46.)  No copy of any form has been filed, and Barnes cannot cite the name, contents, or purpose of the form.  (Id. at 46–47.)

[11] The parties do not agree that Barnes sent the PowerPoint to Hodges for the NPSB's review.  Barnes claims he did.  (Doc. 1 ¶ 26; Doc. 19-2 at 40.)  However, Hodges, Dr. Gregory Eagerton, and Marguerite Summey, all of whom were involved in Barnes's hiring decision, have no recollection of ever having seen the PowerPoint.  (Doc. 19-5 at 44; Doc. 20-2 at 36; Doc. 20-4 at 22.)  Moreover, the PowerPoint that Barnes

(composed of Marguerite Summey,[12] Donna Kovalick,[13] and Kathy Burgess-Brown[14]) reviewed Barnes's application materials and recommended that he start as a Nurse I, Level III, Step 9, and that his salary should be $62,829. ((Doc. 19-5 at 37; Doc. 19-6 at 23-24; Doc. 20-6 at 10; Doc. 21-3 ¶¶ 4-6; Doc. 21-4 at 1-2.) The NPSB found that Barnes's nursing experience benefitted only his own patients and that Barnes did not have sufficient demonstrated outcomes to start as a Nurse II. (Doc. 20-2 at 74-76; Doc. 21-19 at 15-23.) Subsequently, the Nurse Executive, Dr. Gregory Eagerton, approved the NPSB's recommendation. (Doc. 20-2 at 18, 72-73.)

On June 13, Hodges informed Barnes of the starting level and salary of the position he was being offered. (Doc. 19-2 at 51; Doc. 23-3 at 24.) Upon receiving this information, Barnes told Hodges that there was a mistake and that he should have been hired as a Nurse II, based on his education and experience. (Doc. 1-5 at 1-2; Doc. 19-2 at 51; Doc. 23-3 at 24.) That same day, Barnes

---

claims to have sent to Hodges on June 5, 2013, is dated November 3, 2015. (Doc. 23-8 at 2.)

[12] Summey is a Nurse III at the Durham VA who works as a nurse educator. (Doc. 19-5 at 12.) At all relevant times, Summey was a co-chair of the NPSB. (Id. at 37; Doc. 25 at 85.)

[13] Kovalick is a Nurse III at the Durham VA who works as a nurse manager. (Doc. 19-4 at 10.) At all relevant times, Kovalick was a co-chair of the NPSB. (Doc. 19-5 at 37; Doc. 25 at 86.)

[14] Burgess-Brown is a Nurse III at the Durham VA who works as the Safe Patient Handling and Mobility Coordinator. (Doc. 19-6 at 15-17.)

sent Hodges an email repeating this belief and inquiring as to whether the NPSB would reconsider his starting grade and salary. (See Doc. 1-5.)  On June 14, Hodges responded by email to confirm that Barnes had declined the offer and advised him that if he asked the NPSB to reconsider, it might choose to "move forward with another candidate."  (Id. at 1.)

Barnes took the language in Hodge's email to mean that he had to accept the position immediately or it would be given to another candidate.  (Doc. 23-3 at 26.)  As a result, Barnes explains, he accepted the Nurse I position "against [his] will" because he "needed a job."  (Doc. 19-2 at 49-51, 84; Doc. 23-3 at 26-29.) However, when he accepted the position, Barnes was still under the impression that the NPSB would reconsider his starting grade and salary.  (Doc. 19-2 at 50-51; Doc. 23-3 at 28.)

Barnes began working at the Durham VA on July 14, 2013, and, around that time, attended an orientation for new employees.  (Doc. 23-3 at 29.)  While giving a presentation at the orientation, Summey mentioned that a Nurse II typically has two to three years of experience.  (Id.)  Upon hearing this, Barnes told Summey that he felt he should have been hired as a Nurse II.  (Id.)  In response, Barnes says, Summey "apologized and told [Barnes] that nurses are supposed to have a chance to negotiate their salaries."

(Id. at 30.)[15]

During the orientation, Barnes claims, he met other African American nurses who complained that their salary did not reflect their experience or education level.  (Doc. 19-2 at 55; Doc. 23-3 at 30.)  However, the only admissible evidence on this front is from nurse Regina McNeil, who confirmed that she complained unsuccessfully about her salary, and from Eagerton, who acknowledged that nurse manager Lisa Lowe did complain about her salary.  (Doc. 20-3 at 15-17; Doc. 23-4 at 10.)[16]

During Barnes's first few weeks working at the Durham VA, he

---

[15] Summey denies she said this.  (Doc. 22-1 at 26.)

[16] Barnes also contends that Osie Brigman complained about her salary. But the record contains no admissible evidence as to Brigman, and the testimony as to Lowe is hearsay.  Barnes also claims he spoke with Daniel Harrison, a Caucasian Emergency Room nurse, at the same orientation, who allegedly said he had negotiated his salary.  (Doc. 23-3 at 30-31.) Here, too, there is no admissible evidence from Harrison, only Barnes's and McNeil's own statements about what Harrison allegedly said.  (Doc. 23-4 at 15-16; Doc. 19-2 at 29-30.)  Barnes cites McNeil's claim that he "vividly" remembers speaking to a Caucasian female nurse who worked in the catheter laboratory, had six years of experience, and claimed to have negotiated her own salary.  (Doc. 23-4 at 15-16).  This, too, is inadmissible hearsay.
Defendants deny that Harrison was able to negotiate his salary but acknowledge that the salary from his initial quote was increased because the NPSB noticed an error in the quote it recommended and corrected it on its own initiative.  (Doc. 19 at 17-18; Doc. 21-19 at 23-25.) Specifically, the NPSB noticed that the level and step it recommended for Harrison did not take into account Harrison's year of experience as a nurse.  (Doc. 21-19 at 23-25).  As a result, his recommendation, the NPSB determined, was too low.
Defendants also note that Harrison is dissimilar to Barnes in a number of ways: (1) while Barnes is a nurse in the Psychiatry Unit, Harrison is nurse for the Emergency Room; (2) the NPSB panel that made the recommendation for Barnes was composed of different members than the panel that made the recommendation for Harrison; and (3) Harrison was paid less than Barnes.  (Doc. 19-2 at 56-57; Doc. 21-3 ¶ 8; Doc. 21-4 at 2; Doc. 21-5 at 2.)

met with Susan Collin,[17] Kerri Wilhoite,[18] McNeil, and Ossie Brigman to discuss nurses' salaries. (Doc. 19-2 at 28.) At the meeting, Wilhoite told the three nurses "in a very threatening manner" that they should not "rock the boat" and complain about their salaries because the same group of people who made their initial salary recommendations could consider them when they were up for promotion or advancement every year. (Id.; Doc. 23-3 at 32.)[19] It was at this meeting that Barnes first suspected his non-promotion "could be about race." (Doc. 19-2 at 65-66; Doc. 23-3 at 32.) The meeting concluded with Wilhoite stating that she would meet with Eagerton to discuss their situations and "whether or not [they] would qualify for a promotion or raises." (Doc. 23-3 at 33.) Barnes never heard back from Wilhoite. (Id. at 34.)

In response to hearing about Barnes's complaints, Eagerton had several discussions with Kovalick, "may have" spoken with Summey, and confirmed that he agreed with the NPSB's recommendation for Barnes. (Doc. 20-2 at 35, 38-43.)

On October 17, 2013, Barnes contacted an Equal Employment Opportunity Commission ("EEOC") counselor at the Agency's Office

---

[17] Collin was the Nurse Manager for the Psychiatric Unit at the VA from June 2013 until early August 2013. (Doc. 19-3 at 7-8).

[18] Wilhoite was the Associate Chief of Nursing at the time of this conversation. (Doc. 19-2 at 28.) She is now the Nurse Executive at a VA facility in Prescott, Arizona. (Doc. 20-7 at 3.)

[19] Barnes says he received a similar warning from Summey. (Doc. 19-2 at 74.)

of Resolution Management to discuss his concerns. (Doc. 21-6 ¶ 5.) Barnes filed a formal complaint with that office on January 19, 2014. (Id.) A hearing for the case took place on November 17, 2015. (Doc. 1-8 at 1-2.) On May 4, 2016, the Agency issued a Final Order finding that the Durham VA's actions were not the product of racial discrimination. (Doc. 21-8 at 10; Doc. 21-9 at 1.)

## C. Barnes's Non-Promotion

On August 20, 2015, five members of the NPSB (Kovalick and four others) considered Barnes for promotion. (See Doc. 25 at 83.)[20] They reviewed his proficiency report (id. at 74-79) and recommended that he not be promoted because he met none of the nine elements. (Id. at 82–84.) On September 9, Eagerton approved this recommendation. (Id. at 83). Barnes was found not to have the kind of performance that contributed to the nursing unit as a whole, and neither his teaching experience nor working as a preceptor[21] or charge nurse qualified him as a Nurse II, as Barnes contended. (Doc. 24 at 110-20, 147-155.)[22] On September 30, Barnes

---

[20] Starting in 2015, and continuing into the present, Barnes has worked in an outpatient clinic in Raleigh that is part of the Durham VA network. (Doc. 19-2 at 15-21.) He transferred to Raleigh because it was closer to his home. (Id. at 20.)

[21] A preceptor is a nurse who helps to orient new nurses to their units and to working according to the Durham VA's policies and procedures. (Doc. 19-2 at 60.)

[22] Though neither has a specific memory of their actions in Barnes's non-promotion, Eagerton and Kovalick reviewed Barnes's proficiency report

was informed of his non-promotion (Doc. 23-3 at 8; Doc. 25 at 85) but did not appeal (Doc. 24 at 123).

On November 6, 2015, Barnes contacted an EEOC counselor regarding his non-promotion. (Doc. 21-11 at 3.) On December 3, 2015, Barnes filed a second EEOC complaint, claiming that his non-promotion was the result of racial discrimination and retaliation. (Doc. 21-10 at 1.)[23] After conducting an investigation, the EEOC informed Barnes on June 24, 2016, of his right to have a hearing or an immediate final decision. (Doc. 21-11 at 1). Barnes did not respond to this notice. (Id.) Instead, he filed his complaint in this court on July 12, 2016, alleging discrimination based on his race and retaliation based on his EEOC complaint, both under

───────────────

as part of the telephonic examination for Barnes's second EEOC complaint and testified that they agree with their initial assessment that Barnes met none of the nine required elements at the time that he was being considered for promotion. (Doc. 24 at 110-20, 147-55.) In substance, Kovalick explained that in order to meet any of the elements, a Nurse II has to be able to show that his actions contributed to the nursing unit as a whole, and that Barnes's proficiency report did not show this kind of unit level contribution as to any of the elements. (Id. at 110-20.) Kovalick also mentioned that none of Barnes's experience teaching or working as a preceptor demonstrated the kind of positive outcomes on the nursing unit to qualify him as a Nurse II. (Id. at 116-20.) Eagerton also noted that neither Barnes's teaching nor service as a preceptor qualified him to be a Nurse II (id. at 152-54) and that, based on his review of Barnes's proficiency report, he agrees that Barnes met none of the nine criteria (id. at 151).

[23] Specifically, Barnes filed this claim against "the NPSB board consisting of Marguerite Summey and Donna Kovlick [sic]." (Doc. 23-7 at 1.) However, Summey did not serve on Barnes's promotion board, and there is no evidence that Kovalick was aware of Barnes's first EEOC complaint until a few weeks before the November 17, 2015 hearing, which was after the NPSB recommended that Barnes not be promoted. (See Doc. 24 at 134.)

Title VII of the Civil Rights act of 1964 and 42 U.S.C. § 2000(e) et seq. (Doc. 1.) Then, on September, 26, 2016, the EEOC rendered a final decision finding no discrimination or retaliation. (Doc. 21-11 at 1, 8.)

Defendants now move for summary judgment on the grounds that there is insufficient evidence that the Durham VA discriminated based on race and because Barnes was not qualified to have been hired at, or promoted to, Nurse II. (Docs. 18-19.)[24]

## II. ANALYSIS

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact is present if the evidence shows that a reasonable jury could return a verdict for the nonmoving party. Foster v. Univ. of Maryland-E. Shore, 787 F.3d 243, 248 (4th Cir. 2015). In determining a motion for summary judgment, the court views the evidence in the light most favorable to the non-moving party and resolves all reasonable inferences in their favor. Id. In evaluating documents submitted in support or opposition of a motion for summary judgment, the court may reject inadmissible evidence, such as hearsay. See Fed. R. Civ. P. 56(c); Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 962 (4th

---

[24] In July of 2017, Barnes was promoted to Nurse II level. (Doc. 35 at 8.)

Cir. 1996).

Barnes has two distinct claims: (1) that his being hired as a Nurse I was the result of racial discrimination, and (2) that his non-promotion in 2015 was the result of racial discrimination and retaliation for having filed an EEOC complaint. Each claim will be addressed in turn.

### A.    Hiring as a Nurse I

Defendant argues that Barnes's first claim is not properly before the court because Barnes failed to exhaust his administrative remedies when he did not contact an EEOC counselor within forty-five days of suspecting that his hiring was the result of racial discrimination, as required by 29 C.F.R. § 1614.105(a)(1). (Doc. 19 at 10-12.) In response, Barnes argues that Defendant waived this argument when it stipulated at the EEOC hearing that "there are no procedural defenses regarding timeliness initiating contact and/or filing the Complaint or anything that brought us to this point." (Doc. 1-8 at 1-2.)

The forty-five day limit is not jurisdictional and "is subject to equitable doctrines such as tolling or estoppel." Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113 (2002). Barnes points to those courts that hold that an agency must raise a defense of timeliness in the administrative record, see Johnson v. Vilsack, No. CA 3:10-3254-MBS-SVH, 2013 WL 1316494, at *8-9 (D.S.C. Mar. 28, 2013), and that "whenever an agency issues a decision on the

merits of an [EEOC] complaint without addressing timeliness," as it did here, "the agency waives its defense of untimely exhaustion of administrative remedies," Fletcher v. Carter, No. CV PX 15-3897, 2017 WL 876485, at *6–7 (D. Md. 2017) (quoting Johnson, 2013 WL 1316494, at *9 (citing Ester v. Principi, 250 F.3d 1068, 1072 (7th Cir. 2001))). However, the Fourth Circuit appears not to have resolved the issue of when an agency can be deemed to have waived a defense of untimely exhaustion of administrative remedies, but has urged trial courts to apply a "flexible rule which requires a case-by-case examination to determine if an equitable tolling of the filing period is appropriate." Harvey v. New Bern Police Dep't, 813 F.2d 652, 654 (4th Cir. 1987). Moreover, at least one court has concluded that there is no waiver unless the agency specifically finds that the plaintiff timely exhausted her remedies. Rowe v. Sullivan, 967 F.2d 186, 191 (5th Cir. 1992). In light of this uncertainty and given that Barnes's claims fail on other grounds, the court will assume, without deciding, that Defendant has waived its right to raise its timeliness challenge now.

Barnes first argues that this claim should survive summary judgment because Defendant is making a different argument now than it did during the first EEOC proceedings. In a pre-hearing statement for Barnes's first EEOC claim, Defendant argued that the case turned on whether nurses are allowed to negotiate their

salaries at the Durham VA.  (Doc. 1-9 at 1.)  Barnes claims that

Defendant is now arguing that, regardless of salary negotiations,

Barnes was not qualified to be hired as a Nurse II.  (Doc. 23 at

21-23.)  While Barnes initially suggests but then concedes that

Defendant's actions do not constitute judicial estoppel,[25] he

argues that this shift in argument should at least create an

inference that Defendant's stated reasons for hiring him as a Nurse

I were pretext for racial discrimination.  (Id.)  Defendant

contends that it has not changed its position, that it argued

Barnes was not qualified to be hired as a Nurse II during the first

EEOC hearing, and that its position that Barnes was not qualified

to be a Nurse II is not inconsistent with arguing that nurses at

the Durham VA cannot negotiate their salaries.  (Doc. 28 at 1-3.)[26]

It is true that "[t]he fact that an employer 'has offered

different justifications at different times for [an adverse

employment action] is, in and of itself, probative of pretext.'"

---

[25] Judicial estoppel requires three elements: (1) that the party to be estopped must be advocating a position inconsistent with one taken in prior litigation; (2) that the prior inconsistent position must have been accepted by the court; and (3) the party against whom judicial estoppel asserted must have intentionally misled the court in order to gain an unfair advantage. Zinkand v. Brown, 478 F.3d 634, 638 (4th Cir. 2007).  Barnes "concedes that the third prong would be very difficult to satisfy." (Doc. 23 at 22.)  The court agrees, seeing no evidence to satisfy the third element.

[26] Defendant also argues that because this court is hearing Barnes's case de novo, any inconsistencies in its past statements are not relevant. (Doc. 33 at 25.)  Because the court finds that Defendant has not presented inconsistent factual arguments as to its actions towards Barnes, this argument need not be further addressed.

16

Jacobs v. N.C. Admin. Office of the Courts, 780 F.3d 562, 576 (4th Cir. 2015) (citing Sears v. Roebuck & CO., 243 F.3d 846, 852-53 (4th Cir. 2015.)) However, this generally involves the proffering of different factual reasons for the employer taking an adverse employment action (post-hoc rationalizations), not different legal arguments as to why the act that the employer took was not an act of illegal discrimination. See id.; Sears, 243 F.3d at 852-53; Holley v. N. Carolina Dep't of Admin., N.C., 846 F. Supp. 2d 416, 436-37. (E.D.N.C. 2012); Dennis v. Columbia Collection Med. Ctr., Inc., 290 F.3d 639, 648 n. 4 (4th Cir. 2002). Further, minor discrepancies in a defendant's explanations do not establish pretext — the plaintiff must point to actual conflicting explanations which related to the core substance of the employer's articulated justification. Propst v. HWS Co., Inc., 148 F. Supp. 3d 506, 528 (W.D.N.C. 2015).

Even if Defendant has shifted the focus of its legal argument, it has not changed its factual statements surrounding Barnes's qualification as Nurse II or its policy against negotiating salaries. Further, Defendant did argue that Barnes was not qualified to be a Nurse II during the first EEOC hearing;[27] thus, it does not appear that Defendant has changed its argument. (Doc. 21-19 at 45-49.) As such, Defendant has not offered inconsistent

---

[27] Barnes even includes this fact in his complaint. (Doc. 1 ¶¶ 82-83.)

17

explanations for Barnes being hired as a Nurse I, and Barnes's argument fails.

On the merits, Barnes argues that that his hiring as a Nurse I is evidence of racial discrimination because he was qualified to be hired as a Nurse II. (Doc. 23 at 18-21.) Barnes also argues that his inability to negotiate his salary, while he claims at least two Caucasian nurses were permitted to do so, is further evidence of racial discrimination. (Id. at 15-18.) Defendant argues that Barnes was not qualified to be hired as a Nurse II, no nurses at the Durham VA negotiated their salaries, and Barnes cannot point to a similarly-situated comparator from a non-protected class who was treated more favorably. (Doc. 19 at 14-26.)

Barnes has no direct evidence of discrimination and therefore proceeds under the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Under McDonnell Douglas, to state a prima facie case of unlawful discrimination a plaintiff must show that (1) he is a member of a protected class, (2) he has suffered an adverse employment action, and (3) other employees who are not members of the protected class were treated more favorably. See Bryant v. Bell Atl. Md. Inc., 288 F.3d 124, 133 (4th Cir. 2002). However, a plaintiff is not required to point to a similarly-situated comparator to succeed on a discrimination claim. Bryant v. Aiken Reg'l Med. Centers Inc., 333 F.3d 536,

545-47 (4th Cir. 2003). Instead, a plaintiff can succeed on a race discrimination claim if the circumstantial evidence suggests discrimination. <u>Dennis</u>, 290 F.3d at 648 n.4.

If a prima facie case has been made, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions. <u>McDonnell Douglas</u>, 411 U.S. at 802. The burden on the employer at this stage is one of production. <u>St. Mary's Ctr. V. Hicks</u>, 509 U.S. 502, 509-11 (1993). If the employer sets forth legitimate, nondiscriminatory reasons for its actions, then the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the employer's given reasons "were not its true reasons, but were a pretext for discrimination." <u>Reeves v. Sanderson Plumbing Prod., Inc.</u>, 530 U.S. 133, 143 (2000). A plaintiff can demonstrate pretext by showing that the employer's explanation is not credible or by demonstrating illegal discrimination through circumstantial evidence. <u>Mereish v. Walker</u>, 359 F.3d 330, 336 (4th Cir. 2004).

Barnes's argument that he was not allowed to negotiate his salary, while Caucasian nurses were, fails because it is not supported by admissible evidence. Fed. R. Civ. P. 56(c); Fed. R. Evid. 801(c). His claim as to the unnamed nurse is supported only by the hearsay statements of McNeil and his recollection of them. (Doc. 23-4 at 15-16; Doc. 19-2 at 29-30.) Moreover, not only does Barnes not have any admissible evidence to support his claim that

Harrison was able to negotiate his salary, Barnes also has not rebutted Defendant's argument that Harrison merely had his salary corrected due to an error. (Doc. 21-3 ¶¶ 8-10; Doc. 21-5 at 2.)[28] In contrast to Barnes's hearsay evidence, there is record evidence that the Durham VA has a policy that nurses cannot negotiate their salaries. (Doc. 19-3 at 18; 20-2 at 25-26; Doc. 20-7 at 11, 19-20.)

Barnes's argument that his hiring at Nurse I, when he was qualified to be hired as a Nurse II, is evidence of unlawful racial discrimination also fails. The decision to hire Barnes as a Nurse I was subjective based on published qualifications not alleged to be discriminatory, was made unanimously by the NPSB, and was

---

[28] Barnes claims that he was asking the NPSB to *correct* his salary to be that of a Nurse II, just as they corrected Harrison's salary to reflect his experience. (Doc. 23 at 17-18.) However, Barnes misperceives the objective nature of the correction that the NPSB made in contrast to the subjective nature of the change he requested. The two are categorically different. In addition to these evidentiary problems, Harrison is too dissimilar to serve as a comparator because he did not work in the same nursing unit as Barnes and because the NPSB that recommended Harrison's starting level was composed of different members than the NPSB that recommended Barnes's starting level. See Haywood, 387 F. App'x at 359 (citing Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992)) (noting that a plaintiff is required to show that he is similar in all respects to a comparator and that, among other things "[s]uch a showing would include evidence that the employees dealt with the same supervisor."); Laing v. Fed. Exp. Corp., 703 F.3d 713, 719-20 (4th Cir. 2013) (explaining that comparators must be similarly situated to the plaintiff, "but for the protected characteristic"); Hurst v. D.C., 681 F. App'x 186, 193 (4th Cir. 2017) (noting that when different decision makers are involved two plaintiffs are rarely similarly situated in all relevant respects); Merrill v. McCarthy, 184 F. Supp. 3d 221, 245-46 (E.D.N.C. 2016) (quoting Roberts v. Lubrizol Corp., 582 F. App'x 455, 459 (5th Cir. 2014)) (noting that comparators should share the same supervisor). (Doc. 21-4; Doc. 21-5.)

confirmed by Eagerton. See Evans, 80 F.3d at 960 (stating that job performance and relative employee qualifications are legitimate, nondiscriminatory reasons for any adverse employment decision); Page v. Bolger, 645 F.2d 227, 230-32 (4th Cir. 1981) (holding that the testimony of a promotion board that they did not discriminate against a candidate of the basis of their race was enough to overcome a plaintiff's prima facie case of racial discrimination). (Doc. 20-2 at 62-63.) Further, from the beginning of the first EEOC investigation until the present, the members of the NPSB who recommended that Barnes start as a Nurse I have been consistent in their explanations of that decision. (Doc. 19-6 at 19-37; Doc. 19-5 at 82-93; Doc. 21-19 at 18-23.) See Smith v. Flax, 618 F.2d 1062, 1067 (4th Cir. 1980) (noting that it is the perception of the decision maker, not the self-assessment of the plaintiff which is relevant to determining a plaintiff's qualifications). This court's determination is not whether the decision to hire Barnes as a Nurse I was prudent, but rather whether it was the product of unlawful racial discrimination. DeJarnette v. Corning Inc., 133 F.3d 293, 298-99 (4th Cir. 1998) (citing Giannopoulus v. Branch & Brock Confections, Inc. 109 F.3d 406, 410-11 (7th Cir. 1997.) There is no admissible evidence that it was the latter.

Thus, Barnes fails to provide sufficient evidence to set out a prima facie case that his hiring as a Nurse I resulted from

unlawful discrimination based on race, and his claim cannot survive summary judgment.[29]

### B. Barnes's Non-Promotion Claims

#### 1. Exhaustion

Defendant first argues that Barnes's non-promotion claims are not properly before the court because Barnes failed to exhaust his administrative remedies on his second EEOC claim before filing suit in this court. Defendant emphasizes that Barnes failed to respond to the EEOC's letter advising of his right to a hearing or an immediate decision but instead filed this action before awaiting the EEOC's final decision. (Doc. 28 at 4.) Barnes argues that he properly brought suit on his non-promotion claims because he needed only to wait 180 days after filing his EEOC claim to file his federal suit. (Doc. 23 at 4.)

---

[29] Even if Barnes could state a prima facie case, his claim would still fail because Defendant has given legitimate, nondiscriminatory reasons for his being hired at the Nurse I level. Specifically, Defendant has offered evidence that the NPSB and Eagerton reviewed Barnes's application according to its legitimate criteria and found Nurse I to be the appropriate starting position. See Page, 645 F.2d at 230–32. This shifts the burden to Barnes to show that these reasons were simply a pretext for racial discrimination. Evans, 80 F.3d at 960. Barnes has not done so. Perry v. Mail Contractors of Am., Inc., 589 F. App'x 617, 619 (4th Cir. 2014) (absent evidence that the allegedly discriminatory decision maker knew of the aggrieved employee's race, no reasonable jury could conclude that the stated legitimate reason for the challenged employment action was a pretext for discrimination); Matthews v. Waukesha Cty., 759 F.3d 821, 827–29 (7th Cir. 2014) (noting the need to show that a decision maker knew of the plaintiffs race in a racial discrimination claim); Pearson v. Massachusetts Bay Transp. Auth., 723 F.3d 36, 41–42 (1st Cir. 2013) (affirming summary judgment on a claim of racial discrimination in employment where the record did not show that the decision makers knew plaintiff's race).

In the Fourth Circuit, "[i]t is entitlement to a 'right to sue' notice, rather than its actual issuance or receipt, which is a prerequisite to the jurisdiction of the federal courts under Sec. 2000e-5(f)(1)." <u>Davis v. North Carolina Dept. of Correction</u>, 48 F.3d 134, 140 (4th Cir. 1995.) "Entitlement to an EEOC right to sue letter is triggered 180 days after the date on which the EEOC charge is filed." <u>Craft v. Fairfax Cnty, Gov't</u>, No. 1:16CV86(JCC/MSN), 2016 WL 1643433, at *3 (E.D. Va. Apr. 26, 2016) (citing <u>Perdue v. Roy Stone Transfer Corp.</u>, 690 F.2d 1091, 1093 (4th Cir. 1982)). This is an exception to the general rule, under which Defendant argues, that a plaintiff must file suit in a federal court within 90 days of receiving notice of the EEOC's final decision in order to have exhausted his administrative remedies. 42. U.S.C. § 2000e-16(c); 29 C.F.R. § 1614.407; <u>Harvey v. City of New Bern Police Dep't</u>, 813 F.2d 652, 653 (4th Cir. 1987). Barnes waited more than 180 days after filing his second EEOC complaint to file his complaint with this court, and the EEOC had not made a final decision on Barnes's complaint at that time. Thus, it appears as though Barnes exhausted his remedies and the issues presented in his second EEOC complaint are properly before this court. As with Defendant's procedural challenge to Barnes's first EEOC claim, however, because his non-promotion claims fail on other grounds, the court can likewise assume, without deciding, that Barnes has exhausted his administrative remedies and proceed

to address the merits of his claim.

## 2. Retaliation Claim

Barnes argues that he was qualified for promotion to Nurse II in 2015, even more so than when he was hired,[30] and that he was not promoted in retaliation for having filed his December 3, 2015 EEOC complaint. He stresses Wilhoite's admonition to the group of complaining nurses, including himself, in the summer of 2013 that they "shouldn't be making complaints about [their] salaries" and "complain too much" because it would "upset" the NSPB, who "are the people that review [their] salaries every two years and decide whether [they] get promoted." (Doc. 23 at 28; Doc. 23-3 at 32; Doc. 23-4 at 12.) Similarly, he claims that Summey told him that "if [he] complained about [his] salary that the nursing board members were there for a long time and that they would pretty much not promote [him]." (Doc. 19-2 at 74.)[31] Barnes further claims that Kovalick was informed that she would have to testify at the November 17, 2015 hearing for Barnes's first EEOC complaint, and

---

[30] Barnes argues that he was qualified to be promoted to Nurse II because: (1) he teaches a prevention and management of disruptive behavior class at the Durham VA; (2) he is a preceptor and a recruiter at the Durham VA; (3) he is a charge nurse; (4) he worked to create a reward system to reduce the use of restraint utilization; and (5) he worked in a bedside shift reporting project that resulted in reduced bedside sores in patients. (Doc. 23 at 10-11; Doc. 24 at 82-83.)

[31] While this is the only reference to Summey making this threat, and Barnes may have meant to refer to Wilhoite, the court accepts his statement at face value in light of the summary judgment standard.

was thus reminded of it, just before she served on the NPSB that recommended against the promotion. (Id. at 29.)[32] Lastly, Barnes argues, but without elaboration, that his non-promotion was another act of unlawful discrimination based on race. Defendant responds that Barnes cannot show a causal connection between his protected EEOC activity and his non-promotion and that his non-promotion was unrelated to his race. (Doc. 28 at 14.)

In order to establish a claim of retaliation under Title VII, a plaintiff must show that (1) he engaged in a protected activity that was known to the decision-maker; (2) his employer took adverse action against him; and (3) a causal relationship existed between the protected activity and the adverse employment activity. Foster, 787 F.3d at 250 (4th Cir. 2015). However, "[m]erely complaining in general terms of discrimination or harassment, without indicating a connection to the protected class or providing facts sufficient to create that inference" is not enough to survive summary judgment. Young v. HP Enterprise Servs., LLC, No. 1:10-CV-1096, 2011 WL 3901881, at *5 (E.D. Va. Sept. 5, 2011) (internal citation and quotation marks omitted). If a plaintiff succeeds in

---

[32] Barnes also argues that Summey, who knew about Barnes's first EEOC complaint, was a part of Barnes's non-promotion. However, Summey did not serve on, nor is there any evidence he provided any input into, the NPSB members who considered Barnes's promotion. Thus, Barnes's argument that Summey was a part of a retaliatory act against him fails. Barnes does not argue, nor is there any evidence, that Summey's knowledge of the EEOC complaint can be imputed to Kovalick, her co-chair of the NPSB. On this record, any such contention would be purely speculative.

making a prima facie retaliation claim, the burden shifts to the defendant to produce evidence that its actions were not retaliatory. Foster, 787 F.3d at 250. If the defendant does so, then the plaintiff must show by a preponderance of the evidence that the defendant's asserted grounds for taking its action were a pretext for retaliation. Id. at 250; Guessous v. Fairview Prop. Investments, LLC, 828 F.3d 208, 216–17 (4th Cir. 2016). To establish pretext in a Title VII retaliation claim, a plaintiff must show that his protected activity was a "but-for" cause of the adverse employment action. Univ. of Tex. Sw. Med. Ctr. V. Nassar, 133 S. Ct. 2517, 2532–34 (2013). When proceeding under the burden shifting framework, however, this is met by showing pretext and that discrimination was the "real reason for the challenged conduct." Foster, 787 F.3d at 252.

Here, Barnes fails to state a prima facie case because he cannot demonstrate that when the NPSB recommended his non-promotion, any member had any knowledge he had filed an EEOC complaint. His claim that Kovalick knew because she had been informed before the vote that she would be needed to provide testimony for the EEOC regarding his first complaint is unsupported by any admissible evidence. (Doc. 23 at 29.) Barnes relies on the EEOC's Report of Investigation from his second EEOC claim. (Id.; Doc. 24 at 8.) However, the portion of the report he cites merely repeats *his own contention* that Kovalick and Summey were

"asked to provide testimony to an EEOC investigator sometime prior to the August 2015 Board decision and in an EEOC hearing in November 2015." (Doc. 24 at 8.) There is no evidence to support this claim. Further, Kovalick testified that she did not know anything about Barnes's first EEOC complaint until "approximately [two] weeks before" November 17, 2015. (Doc. 24 at 134.)[33] Thus, Barnes has not proffered any evidence that Kovalick was aware of his protected EEOC activity at the time she voted on August 20, 2015, to recommend against his promotion. (Doc. 24 at 134.)

Further, apart from Kovalick, Barnes has not addressed the fact that the other four members of his five-member NPSB promotion board – at least two of whose votes he had to receive for a recommendation of promotion - had no knowledge of his prior EEOC complaint. (Doc. 24 at 165; Doc. 25 at 14, 27, 44.) Nor has he argued, or provided any evidence, that Eagerton - who was the ultimate decisionmaker - knew of Barnes's EEOC activity or approved of the non-promotion in any retaliatory fashion.

Given the subjective nature of a candidate's qualification for Nurse II and the unrebutted efforts by the NPSB to ensure that its voting members not know the candidate under consideration,

---

[33] Summey was aware of Barnes's EEOC activity prior to Barnes's non-promotion because she spoke with Barnes's EEOC investigator, as part of a series of telephonic examinations, on May 22, 2014. (Doc. 22-1.) However, Summey was not involved in Barnes's promotion decision, and her knowledge is therefore not relevant.

Barnes has failed to state a claim for retaliation.[34]

### 3. Discrimination Claim

Lastly, in order for a plaintiff to state a prima facie claim of unlawful discrimination based in a failure to promote, he must show that he (1) is a member of a protected class, (2) applied for the position in question, (3) was qualified for the position in question, and (4) was rejected for the position under circumstances giving rise to an inference of unlawful discrimination. Bryant, 333 F.3d at 544-45. Barnes's claim for non-promotion fails because he cannot show that he in 2015 was qualified to be a Nurse II or that his non-promotion was under circumstances that give rise to an inference of unlawful discrimination.

The NPSB that considered Barnes for promotion concluded he was not qualified for promotion to Nurse II under the applicable standards, which is a legitimate reason for his non-promotion. Evans, 80 F.3d at 960; Smith, 618 F.2d at 1067; Page, 645 F.2d at 230-32. (Doc. 24 at 110-20.) As noted previously, note 22 supra, the NPSB panel found that he met none of the nine required elements. (Doc. 25 at 82-84.) It rejected Barnes's contentions

---

[34] Even if Barnes could make out a prima facie retaliation claim, Defendant offers a legitimate, nondiscriminatory reason for his non-promotion — that he was not qualified for the Nurse II position. While Barnes claims that he was, the NPSB panel that considered his promotion disagreed. Each member also testified that they were not aware of Barnes's prior EEOC activity. This is enough to satisfy Defendant's burden. Page, 645 F.2d 227, 230-32. Given that Barnes has no evidence of pretext and the court cannot say that the NPSB's decision is facially incorrect, this claim could not survive summary judgment.

that his experience teaching and working as a preceptor demonstrated the kind of positive outcomes on the nursing unit to qualify him as a Nurse II.  (Doc. 24 at 110-20, 147-155.)

In addition to Barnes's failure to meet the Nurse II standards, four of the five members of the NPSB have testified that they were not aware of his race at the time they recommended he not be promoted.  Perry v. Mail Contractors of Am., Inc., 589 F. App'x 617, 619 (4th Cir. 2014).[35]  (Doc. 24 at 165; Doc. 25 at 13-14, 27, 44.)  Barnes has put forward no evidence that his non-promotion was related to his race.  As such, he cannot make a prima facie case of unlawful racial discrimination.  Defendant's motion for summary judgment on this claim will therefore be granted as well.

**III. CONCLUSION**

For the reasons stated,

IT IS THEREFORE ORDERED that Defendant's motion for summary judgment (Doc. 18) is GRANTED and this action is DISMISSED WITH PREJUDICE.

                                    /s/   Thomas D. Schroeder
                                    United States District Judge

January 22, 2018

---

[35] Unpublished opinions of the Fourth Circuit are not binding precedent but are cited in this opinion because they are entitled "to the weight they generate by the persuasiveness of their reasoning."  See Collins v. Pond Creek Mining Co., 468 F.3d 213, 219 (4th Cir. 2006).